RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0219p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

TEAMSTERS LOCAL 237 WELFARE FUND, individually and on behalf of all others similarly situated,

      *Plaintiff-Appellant*,

  *v.*

SERVICEMASTER GLOBAL HOLDINGS, INC.; NIKHIL M. VARTY; ANTHONY D. DILUCENTE,

      *Defendants-Appellees.*

No. 22-5981

─────────────────

Appeal from the United States District Court for the Western District of Tennessee at Memphis.
No. 2:20-cv-02553—S. Thomas Anderson, District Judge.

Argued:  July 20, 2023

Decided and Filed:  September 28, 2023

Before:  GILMAN, LARSEN, and NALBANDIAN, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:**  Douglas Wilens, ROBBINS GELLER RUDMAN & DOWD, LLP, Boca Raton, Florida, for Appellant.  Timothy E. Hoeffner, MCDERMOTT, WILL & EMERY LLP, New York, New York, for Appellees.  **ON BRIEF:**  Douglas Wilens, ROBBINS GELLER RUDMAN & DOWD, LLP, Boca Raton, Florida, Christopher M. Wood, ROBBINS GELLER RUDMAN & DOWD, LLP, Nashville, Tennessee, for Appellant.  Timothy E. Hoeffner, Jason D. Gerstein, MCDERMOTT, WILL & EMERY LLP, New York, New York, S. Keenan Carter, BUTLER SNOW LLP, Memphis, Tennessee, for Appellees.

————————————

**OPINION**

————————————

RONALD LEE GILMAN, Circuit Judge.  Pest-control company Terminix faced a "super termite" crisis from 2018 to 2019 that predominately affected homeowners in the Mobile, Alabama area.  Teamsters Local 237 Welfare Fund (the Fund) alleges that Terminix's parent company, ServiceMaster Global Holdings, Inc. (ServiceMaster), its then-CEO Nikhil Varty, and its then-CFO Anthony DiLucente (collectively, the Defendants), violated the federal securities laws through a series of misrepresentations and omissions that understated ServiceMaster's liability for the resulting termite-damage claims, concealed the risk of such claims from investors, and falsely touted the company's customer-retention and growth efforts while strategically using price increases to cause affected customers to drop their service contracts in an attempt to limit its future liability.  The Fund also claims that these actions and omissions constituted a scheme to defraud ServiceMaster's investors by inflating the company's reported financial results relative to its true financial condition.  All of this allegedly caused a financial loss to the Fund as an investor in ServiceMaster's stock.

In response, the Defendants moved to dismiss the lawsuit for failure to state a claim.  The district court concluded that, although the Fund had alleged two potentially actionable misstatements and omissions, it had failed to plead a strong inference that the Defendants had acted with the scienter required by the Private Securities Litigation Reform Act of 1995 (PSLRA), 109 Stat. 737, Pub. L. No. 104-67.  Accordingly, the court dismissed the case.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.    Factual background

This case concerns ServiceMaster's response to a termite crisis and its disclosures and public statements between February 26, 2019 and November 4, 2019 (the Class Period).  ServiceMaster's largest and most important subsidiary, Terminix, provides residential and

commercial pest-control services throughout the United States. During the Class Period, Terminix accounted for approximately 87% of ServiceMaster's revenues and almost 80% of its earnings before interest, taxes, depreciation, and amortization (EBITDA). (EBITDA is a standardized measure of a company's profitability.) The vast majority of Terminix's revenue comes from annual service contracts, under which Terminix regularly inspects its customers' property for signs of a termite infestation. If termites are discovered, then Terminix's service contracts obligate the company to exterminate the termites, repair any damage to the property, and provide further treatment.

In the years preceding the Class Period, ServiceMaster's revenue growth and EBITDA had been declining. To turn things around, ServiceMaster hired new executive leadership in 2017, including the individual Defendants Varty and DiLucente. DiLucente acknowledged ServiceMaster's recent poor results at its Analyst Day, blaming the poor results on an over-emphasis on "short-term profitability." He announced a strategy to improve Terminix's (and therefore ServiceMaster's) business results by emphasizing "long-term sustainable organic growth through outstanding customer service" within Terminix. In explaining how ServiceMaster aimed to "deliver consistently strong revenue and earnings growth," Varty informed investors in a quarterly presentation that, "[a]t Terminix, we are taking a disciplined approach to executing a series of systematic transformational activities to significantly upgrade the customer experience, improve our customer retention rates and profitably grow our market share."

Varty and DiLucente appeared to have Terminix heading in the right direction by the next year. During a presentation given to financial analysts, Varty and DiLucente described Terminix's "transformation efforts [as] on track" and "bearing fruit." And DiLucente focused attention on Terminix's reported growth, commenting that "in the third quarter of 2018, we delivered 7.8% growth in the residential pest control segment." On the first day of the Class Period, February 26, 2019, Varty told investors that Terminix's transformation efforts had resulted in "record revenue" and that the company was continuing to "tak[e] the necessary steps to create a long-term sustainable business model that will [generate] consistent growth." ServiceMaster's quarterly reporting of its financial and business results remained almost

uniformly positive through the first two quarters of 2019 and reflected Varty's and DiLucente's focus on transforming Terminix by emphasizing growth, sustainable business practices, and customer service.

Meanwhile, however, a serious termite infestation had taken hold in parts of the southeastern United States. The Formosan "super termite" thrives in the warm, humid climates found on the Gulf Coast. They infest properties by constructing both above-ground nests inside buildings and large subterranean nests. Formosan termites are aggressive, reproduce quickly, and can cause extensive damage.

The Fund alleges that Terminix's monitoring and treatment of Formosan termite activity was inadequate. Before and during the Class Period, Terminix purportedly did not perform adequate termite inspections, undertreated properties that showed signs of infestation, and failed to conduct appropriate follow-up inspections or retreatment, allowing Formosan infestations to take hold and spread unabated. The hardest hit area was Mobile, Alabama. A number of Terminix customers in that area experienced substantial property damage and brought claims under their service contracts.

According to the Fund, "Terminix took a hard line in resolving [the resulting] termite damage claims, routinely refusing to pay valid claims, making lowball settlement offers, and otherwise forcing customers to pursue legal remedies to obtain relief for their termite-damaged homes." Terminix found itself on the losing end of a series of termite-damage-claim disputes and, "from 2018 to 2020, Terminix was routinely ordered to pay millions of dollars to its customers after being found liable in recurring private arbitrations." The Fund points to several arbitration awards against Terminix during this time period that exceed $1 million, the largest of which totaled about $3.8 million.

In addition to refusing to pay meritorious claims, Terminix took other steps purportedly aimed at insulating itself from financial exposure to the Formosan termite crisis. The company allegedly attempted to cause existing at-risk customers to abandon their annual contracts by raising premiums in 2018, in some cases by more than 1,000%. For those customers who did renew their contracts, Terminix restricted the coverage and benefits that they received. The Fund

also claims that Terminix adopted a policy to appeal any arbitration award over $1 million, regardless of the merits, in order to delay payment.

State regulators took notice and, in February 2019, the Attorney General of Alabama commenced an investigation into Terminix's business practices. The investigation ultimately found that Terminix had "failed to deliver or provide the termite protection services" promised to Alabama customers, and concluded that Terminix's "exorbitantly high annual renewal increases of up to 1,000 percent," were "intended to force customers to cancel their lifetime protection contracts or to accept new Terminix contracts that provided less benefits than consumers' existing lifetime contracts." Terminix ultimately settled with the Attorney General for $60 million, although this settlement was not reached until November 5, 2020, a full year after the end of the Class Period.

ServiceMaster made periodic disclosures throughout the Class Period regarding its financial exposure to Formosan termite-damage claims. On February 26, 2019, the first day of the Class Period, ServiceMaster reported its financial results for the fourth quarter of 2018. DiLucente acknowledged that, among the "other cost drivers in the [fourth] quarter [of 2018]," was a "$2 million . . . damage claims expense increase, predominantly related to activity in a section of the Gulf Coast." On August 6, 2019, while reporting its financial results for the second quarter of 2019, ServiceMaster disclosed another $2 million "in increased damage claims expense primarily due to activity in the Gulf Coast region." Across the same time period, however, ServiceMaster's quarterly and annual SEC filings, which provided information regarding ServiceMaster's accounting for termite-damage-claim accruals, stated that there were "no changes in the significant areas that require estimates or in the underlying methodologies used in determining the amounts of these associated estimates." The company's annual 10-K filing on March 1, 2019 and its quarterly 10-Q filings on May 8, 2019 and August 6, 2019 all contained the following statement:

> Termite damage claim accruals in the Terminix business are recorded based on both the historical rates of claims incurred within a contract year and the cost per claim. Current activity could differ causing a change in estimates. We have certain liabilities with respect to existing or potential claims, lawsuits, and other proceedings. We accrue for these liabilities when it is probable that future costs

will be incurred and such costs can be reasonably estimated. Any resulting adjustments, which could be material, are recorded in the period the adjustments are identified.

The true scope of the termite-damage claims came into focus when ServiceMaster released its financial results for the third quarter of 2019. On October 22, 2019, ServiceMaster announced that it had generated a net income of only $25 million during the third quarter of 2019, 65% less than in the previous year. ServiceMaster also revised its projected full-year EBITDA range to $415–$425 million, a downward adjustment of $20 million that included a "$10 million reduction from the impact of termite damage claims" and "$10 million from targeted revenue reductions principally in the Mobile, Alabama area." The October 2019 announcement blamed the poor results on "termite damage claims arising primarily from Formosan termite activity," and explained that

> [t]ermite damage claims can take years to fully settle, and timing can be difficult to forecast. Assuming the continuation of recent trends, the company expects higher claims costs to continue in the short-term due to increased claims activity. Formosan termite activity has been increasing over the last few years, however due to a number of climatic and environmental factors it remains largely concentrated in the Mobile, Alabama area of the country, which represents less than one percent of Terminix revenue. Starting in 2018, the company initiated mitigating actions to limit our future exposure, including third party claims management, reinforcement of effective processes, improved documentation, and a change in pricing structure.

ServiceMaster published its final report of third-quarter results on November 5, 2019, and held a conference call to discuss this "challenging quarter" with investors and analysts. During the call, Varty elaborated that,

> [i]n the past few years, we have seen an increase in the number and average cost of termite damage claims in the Mobile, Alabama area related to Formosan termite activity. We also have seen an increase in the number of termite damage claims in that region that involve litigation. These [two] trends have increased our termite damage claims cost as a percentage of termite revenue to between 7% and 8%.

The price of ServiceMaster's stock dropped by almost 40% from its trading high during the Class Period following these disclosures. Varty resigned two months later and, in December 2020, Terminix announced that DiLucente would retire.

**B.      The complaint**

After the initial complaint was filed, the district court appointed the Fund as the lead plaintiff and gave it the opportunity to amend its complaint.  The operative Amended Complaint alleges securities-fraud claims "on behalf of all purchasers of ServiceMaster . . . common stock between February 26, 2019 and November 4, 2019."  Count I alleges that ServiceMaster violated Section 10(b) of the Securities Exchange Act of 1934 (the Exchange Act), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, by engaging in a series of misrepresentations and omissions that (1) falsely touted efforts to improve Terminix's growth and profitability, while in reality customers were being strategically pushed away; (2) understated accruals associated with ServiceMaster's liability for termite-damage claims; and (3) concealed the risk of future liabilities for such claims.

In addition to these claims of misrepresentation and omission under Rule 10b-5(b), the Fund alleges in Count I that the Defendants violated Rule 10b-5(a) and (c) by engaging in a fraudulent scheme to mislead investors about the true state of Terminix's business, understating the accruals associated with termite-damage claims, and overstating ServiceMaster's earnings. Count II, on the other hand, alleges that the individual Defendants Varty and DiLucente are liable as "control persons" pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

**C.      Procedural history**

The Defendants moved to dismiss the Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  In considering the Defendants' motion, the district court noted that a significant portion of the Amended Complaint was devoted to contrasting ServiceMaster's public statements that reported increased revenues and emphasized its efforts to transform Terminix by "[i]mprov[ing] customer retention and price realization [to drive] growth" with the alleged reality that Terminix faced enormous potential liability associated with termite-damage claims and was actively seeking to drive its at-risk customers away in an attempt to limit its liability.  The court concluded that such statements were not actionable because they were "generalized statements of optimism that are not capable of objective verification."  Nor had the Fund alleged, according to the court, "how any of the hard information [in these statements], for

example, the company's calculated growth rate for the quarter or the growth reported for Q4 2018 relative to the company's growth in recent quarters, was misleading." Because the Fund does not dispute these rulings on appeal, we have no reason to further discuss the challenged statements that fall into this category.

The district court found, however, that two statements could potentially form the basis of a Rule 10b-5(b) misrepresentation-or-omission claim: (1) the nondisclosure of increasing liability for termite-damage claims in SEC filings, and (2) DiLucente's attribution during a May 7, 2019 earnings conference call of ServiceMaster's increasing pest-control pricing to favorable market conditions, which allegedly was actually due a strategic effort to cause affected customers to drop their service contracts.

According to the district court, ServiceMaster's reports in 2019 "that 'there were no changes in the significant areas that require estimates[,]' including termite damage claims, even though Defendants had known or should have known about the unfavorable trend of growing legal liabilities by that time," "omitted facts [that] would have been material to a reasonable investor reviewing the disclosures during the Class Period." Moreover, the court held that this omission violated Item 303 of the SEC's disclosure rules, 17 C.F.R. § 229.303, which mandates that issuers discuss material adverse trends that will negatively impact net sales or income from continuing operations. The court also considered DiLucente's comment about price increases plausibly misleading because "he likely had additional information about the reasons for the price increases."

Notwithstanding the district court's conclusion that the Fund had alleged two potentially actionable misstatements, the court went on to find that the Fund had failed to plead a strong inference of scienter because the Fund's allegations were "just as consistent with [a] more plausible, non-culpable inference." The court therefore dismissed the Fund's Rule 10b-5(b) misrepresentation-and-omission claims. But because the Defendants had not addressed scheme liability in their motion to dismiss, the court declined at that juncture to extend its ruling to the Fund's Rule 10b-5(a) and (c) scheme-liability claims.

The Defendants subsequently moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure to dismiss the remaining claims. Because the district court concluded that the Fund's scheme-liability claim relied on the same allegations and factual circumstances underlying its misrepresentation-and-omission claims, it found "no reason to deviate from its previous order holding that the Amended Complaint [had] failed to satisfy the PSLRA's heightened" scienter pleading requirements.

Judgment was entered in favor of ServiceMaster after all of the Fund's claims had been dismissed. This timely appeal followed. On appeal, the only question raised is whether the district court correctly determined that the Fund failed to allege a strong inference of scienter.

## II. ANALYSIS

### A. Standard of review

We review de novo the district court's dismissal of a complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 809 (6th Cir. 2022). All allegations of material fact are accepted as true and construed in the light most favorable to the nonmoving party. *Id.* Likewise, "[t]he district court's decision regarding a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is analyzed using the same de novo standard of review employed for a motion to dismiss under Rule 12(b)(6)." *Tucker v. Middleburg-Legacy Place, LLC*, 539 F.3d 545, 549 (6th Cir. 2008). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Id.* (quoting *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007)).

### B. Pleading standard

Ordinarily, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)).

The PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure, however, impose a heightened pleading standard on the Fund's securities-fraud claims. Congress enacted the PSLRA as a check against abusive litigation that can impose "substantial costs on companies and individuals whose conduct conforms to the law." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). The PSLRA requires plaintiffs to "'specify each statement alleged to have been misleading' along with 'the reason or reasons why the statement is misleading,'" and to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 978 (6th Cir. 2018) (quoting *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 942 (6th Cir. 2009)); *accord Astec*, 29 F.4th at 810. Rule 9(b) also requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), "a plaintiff's complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Astec*, 29 F.4th at 810 (quoting *La. Sch. Emps. Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 478 (6th Cir. 2010)).

## C.      Exchange Act § 10(b) and SEC Rule 10b-5 claims

Section 10(b) of the Exchange Act makes it unlawful for "any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). "SEC Rule 10b-5 implements this provision by making it unlawful to, among other things, 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). To state a claim

under § 10(b), a plaintiff must plead with particularity six elements:   "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Inv. Partners, LLC v. Sci-Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *accord In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 469 (6th Cir 2014).

## D.       Scheme-liability claims

Rule 10b-5 also prohibits any person from "employ[ing] any device, scheme, or artifice to defraud" or "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(a), (c). "Rules 10b–5(a) and (c) encompass conduct beyond disclosure violations."  *Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 610 (6th Cir. 2005).  A scheme-liability claim is therefore different and separate from a nondisclosure claim. *SEC v. Rio Tinto PLC*, 41 F.4th 47, 49, 53 (2d Cir. 2022); *but see Lorenzo v. SEC*, 139 S. Ct. 1094, 1102 (2019) (recognizing the "considerable overlap among the subsections of [Rule 10b-5] and related provisions of the securities laws").

Our court has not defined the elements required to state a claim for scheme liability under Rules 10b-5(a) and (c).  *See Benzon*, 420 F.3d at 611 (noting that "there is very little case law explaining more specifically what types of claims are actionable under these provisions").  But the Second Circuit has:  "To state a scheme liability claim, a plaintiff must show:  '(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance.'"  *Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021) (quoting *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216 (S.D.N.Y. 2020)).

## E.       Scienter

Scienter is the only disputed element in this appeal, and it is a required element for all of the Fund's claims.  The PSLRA requires that plaintiffs "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind."  *Tellabs, Inc.*

*v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) (emphasis added) (quoting 15 U.S.C. § 78u-4(b)(2)).  The Supreme Court has made clear that "the inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, [and] thus strong in light of other explanations."  *Id.* at 324.  Therefore, to determine "whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."  *Id*. at 323.  To pass muster, the inference of scienter must be "at least as compelling as any opposing inference of nonfraudulent intent."  *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016) (quoting *Tellabs*, 551 U.S. at 314).

"[S]cienter can be established by either demonstrating a 'knowing and deliberate intent to manipulate, deceive, or defraud' or 'recklessness.'"  *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 812 (6th Cir. 2022) (quoting *Doshi*, 823 F.3d at 1039).  "Recklessness is . . . highly unreasonable conduct which is an extreme departure from the standards of ordinary care," where the "danger . . . must at least be so obvious that any reasonable man would have known of it."  *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011) (internal citations and quotation marks omitted).  It requires something more than negligence and is "akin to conscious disregard," and "typically require[s] multiple, obvious red flags, demonstrating an egregious refusal to see the obvious, or to investigate the doubtful."  *Doshi*, 823 F. 3d at 1039 (internal citations and quotation marks omitted).

We consider "all the allegations holistically."  *Tellabs*, 551 U.S. at 322–23, 326 ("The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." (emphasis in original)).  We do, however, "analyze scienter on a defendant-by-defendant basis." *Astec*, 29 F.4th at 813.  "As part of that analysis, we consult a non-exhaustive list of considerations known as the *Helwig* factors," factors that are "probative of securities fraud." *Helwig*, 251 F.3d at 552 (citing *Doshi*, 823 F.3d at 1039).  They are as follows:

(1) insider trading at a suspicious time or in an unusual amount;

(2) divergence between internal reports and external statements on the same subject;

(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4) evidence of bribery by a top company official;

(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

(6) disregard of the most current factual information before making statements;

(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001) (en banc), *abrogated on other grounds by Tellabs*, 551 U.S. at 317–18, 322–23. "The more of these factors that are present, the stronger the inference that the defendant [acted] with the requisite state of mind." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 473 (6th Cir. 2014).

**F.      The district court correctly held that the Fund failed to plead a "strong inference of scienter"**

Considering all of the allegations holistically and applying the *Helwig* factors, we conclude that the Amended Complaint fails to support a strong inference that the Defendants acted with scienter. Although the Fund has alleged a plausible inference of scienter, the allegations are also consistent with a more plausible nonculpable inference. Accordingly, the district court did not err by dismissing the Amended Complaint.

### 1. *Allegations relating to scienter*

The Amended Complaint's basic proposition concerning scienter is that "[b]ecause of their positions with the Company and their access to material nonpublic information available to them but not to the public, [Varty and DiLucente] knew that the adverse facts [alleged in the Amended Complaint] had not been disclosed to and were being concealed from the public and that the positive representations being made were . . . materially false and misleading." In support of this basic proposition, the Amended Complaint's key allegations can be summarized

as follows:

(1) The Defendants allegedly knew that Terminix was under-treating its customers' properties, and that this would lead to an increased risk of termite damage.

(2) The Defendants allegedly knew of Terminix's growing liability for termite-damage claims because the company was involved in extensive litigation and was repeatedly subject to large arbitration awards for wrongfully denied claims. Moreover, Terminix's attempts to delay payment of these claims and awards indicates awareness of the significant adverse impact they would have on the company.

(3) According to the Fund, Terminix's strategy to drive affected customers out of their service contracts further evinces that the Defendants were aware of the adverse financial liability represented by claims under the contracts.

(4) The Formosan termite crisis and Terminix's pricing strategy was purportedly discussed at steering-committee meetings attended by Varty (and presumably DiLucente, although the Amended Complaint does not specifically so allege).

(5) The Fund points to the resignation of Varty shortly after the adverse disclosures as evidence of his scienter.

In large part, the Fund bases its scienter allegations on the proffered testimony of four confidential witnesses (referred to in the Amended Complaint as CWs 1–4). The information provided in the Fund's allegations concerning the jobs of each of these witnesses is sparse, and the Fund does not attach to the Amended Complaint any affidavits or declarations from the witnesses that would provide more detail or context to their proffered testimony. The sum total of the Fund's confidential-witness allegations is as follows:

**CW1:** CW1 "worked at Terminix between 2017 and 2019 analyzing sales trends and setting pricing," including "analyzing customer claims for Formosan termite damage." This witness proffered that:

(1) Terminix representatives "did a poor job of inspecting [] its customers' homes and businesses."

(2) "[I]mmediately prior to the Class Period, Defendant Varty participated in weekly [Steering Committee] meetings" and other "'leadership team' meetings" with other ServiceMaster executives, "during which the topics of Formosan termite damage claims and the [c]ompany's mitigation efforts were routinely discussed."

(3) Terminix "utilized . . . price increases in an effort to run its own customers off before the customers uncovered any Formosan damage and to cover the increasing litigation costs [that] the [c]ompany was incurring." "Terminix anticipated that their price g[o]uging would lead more than 90% of at-risk customers to cancel their lifetime guarantee contracts."

(4) Termite-related "litigation claims were so overwhelming in Alabama that Terminix's outside counsel had to work out a scheduling agreement limiting counsel to trying 26 cases a year so that it would have at least one week for preparation between trials."

**CW2:** CW2 "worked at ServiceMaster and Terminix between 2005 and 2019 in various positions relating to customer marketing and retention." This witness proffered that:

(1) Prior to the Class Period, "Terminix's problems with the Formosan termite were routinely discussed" at Steering Committee meetings, which CW2 attended.

(2) Terminix "utilized . . . price increases in an effort to run its own customers off before the customers uncovered any Formosan damage and to cover the increasing litigation costs [that] the Company was incurring."

(3) The president of Terminix Residential, Matt Stevenson, "reviewed and signed off on all the marketing materials associated with the price changes."

**CW3:** CW3 was "a former Terminix [] sales manager working in Mobile, Alabama." This witness proffered that:

(1) "Stevenson had to approve every claim over $50,000. . . . [N]early 100% of the claims for $50,000 or more were coming out of Mobile, Alabama."

**CW4:** CW4 was "a Mobile, Alabama branch manager from 2009 to 2018." This witness proffered that:

(1) "[A] random sample of customer contracts in CW4's branch revealed that 40% of properties had not been treated properly or at all in the years leading up to the Class Period."

(2) "Terminix consistently undertreated properties in Mobile, Alabama. For example, if a property should have been treated with 600 gallons of pesticide, Terminix cut costs and may have only used 100 gallons."

The gravamen of all these allegations, according to the Fund, is that the "Defendants were aware or reckless in not knowing that their positive statements during the Class Period regarding the purported success of ServiceMaster's Terminix transformation, and operational

and financial results and trends as a result of the 'transformation' efforts, were misleading and/or lacked a reasonable basis." Furthermore, the Fund argues that "Defendants were aware or reckless in not knowing that their reported EBITDA was inflated as they materially understated the accrual associated with the actual claims that had been made by customers due to the Formosan scheme, and the risk of future claims related to it."

## 2. *The Fund's scienter allegations do not support an inference of scienter that is at least as compelling as any opposing inference of nonfraudulent intent*

The Fund argues that "the district court erred by failing to consider the Amended Complaint's scienter allegations 'collectively' and 'holistically.'" But the district court's evaluation of the competing inferences that can be drawn from the Fund's allegations of scienter belies this contention. The court conceded that the Fund's "allegations can be read to plausibly suggest that Defendants knew they had a problem in Alabama and then misled investors about the extent of the problem, touting their plans for a transformation of the Terminix business as a shield to hide the Formosan termite issues." As recognized by the court, however, the opposing inference is more plausible: namely, that the "Defendants had developed what they thought was a solution to larger problems at Terminix, problems that manifested themselves in the Formosan termite claims in Alabama, and that Defendants disclosed the existence of the problem once it was confronted with significant arbitration awards with reasonable promptness." *See In re Gen. Elec. Sec. Litig.*, 844 F. App'x 385, 389 (2d Cir. 2021) ("[T]he allegations . . . are consistent with the more plausible, non-culpable inference that, before [serious problems arose, the company] had developed what it believed was a workable solution to the . . . issue—a solution that would not adversely affect the [company's] finances in a material way, and that [the company] revised its assessment of the issue and its solution when confronted with [serious problems], and disclosed the financial consequences with reasonable promptness.") We find the district court's assessment persuasive.

### a. *Nondisclosure of the upward trend in termite-damage claims*

The Fund's allegations do not support a strong inference of scienter regarding the alleged omission of an upward trend in termite-damage claims in ServiceMaster's SEC filings. Crucially, as the district court recognized, the company "acknowledged the existence of termite

damage claims, though in a general way and without specific reference to any particular hot spot." ServiceMaster disclosed a total of $4 million in increased liability for termite-damage claims in two different quarterly reports issued over the eight-month-long Class Period. The court further noted that, "[e]ven though the full extent of the termite damage claims did not come to light until October 2019, the[se] disclosures made at earlier times during the Class Period acknowledged the existence of termite damage claims and the steps the company was taking through accruals to prepare for possible liabilities." *See In re Gen. Elec.*, 844 F. App'x at 388–89 ("[E]ven assuming that some of [the company's] statements were misleading, these statements did not amount to a 'sufficiently extreme departure from the standards of ordinary care' to support an inference of recklessness," especially because "[t]he challenged statements were made in the context of [the company's] ongoing disclosures about the . . . problem." (quoting *Setzer v. Omega Healthcare Invs.*, 968 F.3d 204, 215 (2d Cir. 2020)).

And unlike the defendant CEO in *City of Taylor General Employees Retirement System v. Astec Industries, Inc*, 29 F.4th 802 (6th Cir. 2022), whom this court found acted with scienter because the allegations established that he publicly contradicted the most current information available to him, including two specific internal reports, ServiceMaster's disclosures of increasing liability for termite-damage claims were not flatly contradictory to the true state of affairs at the company. *See id*. at 813–14. The Fund, moreover, has not alleged any details about ServiceMaster's internal assessment of the financial impact of the termite crisis beyond the basic fact that the crisis and a response were discussed. And even if ServiceMaster's disclosures misstated the extent of its liability, nothing in the Amended Complaint explains how (if at all) the company assessed what effect the termite crisis in Mobile, Alabama would have on the overall financial condition of ServiceMaster. *See Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1042 (6th Cir. 2016) (discounting the importance of internal data pertaining to "only a part" of a company that contradicted a company's public statements of "its *firm-wide* financial data," (emphasis in original) (citing *Omnicare*, 769 F.3d at 484, as "determining that the disparity between the levels of generality at which the internal reports and external statements were framed" lessened the importance of the divergence for the purposes of scienter (internal quotation marks omitted)).

The Fund relies heavily on the idea that the high volume of litigation faced by ServiceMaster should have alerted the Defendants to the need to disclose more about the financial risks posed by the termite-damage claims. But the Amended Complaint provides little detail about when these awards became final, or how the disclosures about termite-claim liability that the Defendants did make were not adequate at the time that they were made. The Defendants correctly point out that the Fund's attempt to remedy this deficiency with a declaration submitted to the district court in opposition to the Defendants' motion for judgment on the pleadings is improper. *See Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020) ("Plaintiffs cannot . . . amend their complaint in an opposition brief or ask the court to consider new allegations (or evidence) not contained in the complaint.").

Nor is the existence of a pending government investigation sufficient to give rise to a strong inference of scienter. *See Konkol v. Diebold, Inc.*, 590 F.3d 390, 402 (6th Cir. 2009), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48–49 (2011). The Alabama Attorney General's investigation had begun during the Class Period, but it was far from over even by the end of the Class Period.

The Fund's allegations concerning the "mitigating efforts" that ServiceMaster took to insulate itself from financial exposure—namely its plan to drive customers to cancel their contracts by significantly raising premiums—provide the strongest evidence that ServiceMaster's executive leadership knew that the volume of termite-damage claims in Mobile, Alabama would be large enough to negatively impact the company, at least if nothing was done to soften the blow. But even these allegations do not make the inference that the Defendants acted with scienter as strong as the competing nonfraudulent explanation that the Defendants thought that their mitigation efforts would help Terminix limit the damage. After all, as recognized by the Fund itself, Terminix thought that it could get "more than 90% of at-risk customers to cancel their lifetime guarantee contracts."

Far fewer customers ultimately cancelled their contracts than the Defendants had hoped, but their belief that the strategy would be more effective helps to explain why their disclosures through the first three quarters of 2019 did not warn of increasing claims. *See In re Gen. Elec.*

*Sec. Litig.*, 844 F. App'x 385, 388–89 (2d Cir. 2021) (holding that there was not a strong inference of scienter when allegedly misleading disclosures came in the midst of the company's ongoing efforts to fix a problem). Perhaps such disclosures would have been prudent, but the decision not to make them is hardly an "extreme departure from the standards of ordinary care." *See Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011) (quoting *PR Diamonds, Inc. v. Chandler,* 364 F.3d 671, 681 (6th Cir. 2004)).

None of the Fund's other allegations help to establish a strong inference of scienter. To the extent that allegations claiming that a named defendant was "intimately aware" of information underlying misleading disclosures can support a strong inference of scienter, *see, e.g.*, *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 813 (6th Cir. 2022), there is little in the way of comparable allegations here. Scienter is not to be inferred simply by virtue of Varty's and DiLucente's senior positions within ServiceMaster; instead, the Fund "must allege specific facts or circumstances suggestive of their knowledge." *See PR Diamonds*, 364 F.3d at 687–88, 693–94, *abrogated in part on other grounds by Frank*, 646 F.3d at 961.

Nor does the Amended Complaint offer anything more than vague assertions that issues relating to the Formosan termite crisis were discussed amongst ServiceMaster executives. Completely absent is any detail about exactly what was discussed, whether or not the extent of the problem or liability for possible claims were discussed, whether the possible impact on ServiceMaster's financial results was raised, or specifically when the alleged discussions occurred (apart from the vague timeframe of "before the Class Period"). Without this information, the "mere attendance at meetings" where the Formosan termite crisis was discussed does little to establish the kind of "red flags" necessary to support a strong inference of scienter. *See Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1239–43, 1246 (10th Cir. 2016) ("[G]eneralized descriptions of internal meetings . . . do not contribute to a cogent, compelling inference of scienter," especially where the "plaintiffs do not identify any particularized account showing [what] executives knew during the class period."). Furthermore, "the fact that executives are intimately familiar with a core component of their business does little to suggest fraudulent intent." *Pittman v. Unum Grp.*, 861 F. App'x 51, 55 (6th Cir. 2021).

This court's decision in *City of Taylor General Employees Retirement System v. Astec Industries, Inc.*, 29 F.4th 802 (6th Cir. 2022), is instructive. To paraphrase the ruling in that case, "[a]lthough [Varty and DiLucente] likely could have done more to verify the [information that ServiceMaster released], that failure indicates negligence at most" for the reasons expressed above. *See id.* at 816 (citing *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016)). Nor does the timing of their departures support a strong inference of scienter. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009) (holding that "[m]ere conclusory allegations" about the resignations of company executives did not, without more, give rise to a strong inference of scienter).

The Fund has likewise failed to plead a strong inference of scienter against ServiceMaster itself. In this circuit,

> [t]he state(s) of mind of any of the following are probative for purposes of determining whether a misrepresentation made by a corporation was made by it with the requisite scienter under Section 10(b):
>
> a. The individual agent who uttered or issued the misrepresentation;
>
> b. Any individual agent who authorized, requested, commanded, furnished information for, prepared (including suggesting or contributing language for inclusion therein or omission therefrom), reviewed, or approved the statement in which the misrepresentation was made before its utterance or issuance;
>
> c. Any high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance . . . .

*In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 476 (6th Cir. 2014) (alteration omitted) (citation omitted). Varty and DiLucente lack scienter for the reasons articulated above. And the Amended Complaint features almost no allegations about anyone else who played a role in formulating the disclosures at issue in this case, let alone that they knew anything about their truthfulness. *See id.* at 483 (holding that any purported knowledge on the part of executives not alleged to have participated in formulating the challenged statements cannot support scienter).

When considered holistically, the "facts in this case are more consistent with a company playing 'a constant game of catch-up than with fraud.'" *See Pittman*, 861 F. App'x at 57 (quoting *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 399 (S.D.N.Y. 2019)).

Varty's and DiLucente's strategy to insulate ServiceMaster from excessive exposure to termite-damage claims was not as effective as they had hoped it would be. But during the class period, they disclosed that ServiceMaster faced millions in liability for termite-damage claims and told investors that the company's accounting practice was to accrue liability for termite-damage claims "when it is probable that future costs will be incurred and such costs can be reasonably estimated." Without more information about what the ServiceMaster executives knew and when they knew it, the Fund has not supported an inference of scienter that is at least as strong as this nonfraudulent inference.

### b. *DiLucente's comments on Terminix's increased pricing*

Nor has the Fund alleged a strong inference of scienter with regard to DiLucente's comments attributing Terminix's increased pricing to improvements in the market. During a conference call discussing ServiceMaster's financial results for the first quarter of 2019, an analyst posed the following question to DiLucente:

> [I]n your prepared remarks, I heard you mention termite pricing a couple of times being better. That's consistent with some of the survey work that we've done recently on the pest control market. Can you just talk about what's driving the better pricing? Is that just Terminix kind of going out and getting what it feels it deserves, where it's been lacking? Or do you feel just like the market is supportive of better pricing? Could you just sort of frame what's driving the better pricing? Because that's something that we're definitely seeing in our survey work.

DiLucente replied, in relevant part:

> I think the latter explanation you gave is really the best answer. The market can support relatively modest price increases year in, year out, and we typically have done that historically, and we did that this year as well. So if you think about – we bill out for these termite services, the increases per customer [are] relatively small and could be absorbed fairly easily.

As the district court pointed out, DiLucente's answer could be considered misleading given what he knew about Terminix's substantial price increases in Mobile, Alabama. But the context of the question and answer makes an innocent inference of DiLucente's motivation for making the statement far more likely. The analyst's question inquired about general, nationwide

trends, and even suggested that his own data indicated that the market supported price increases. DiLucente answered in equally general terms, speaking to a nationwide trend. And nothing in the Fund's allegations suggests that Terminix's reported pricing improvements that quarter were due solely to the substantial increases in Mobile, Alabama.

### c. *The alleged fraudulent scheme*

The same analysis applies to the element of scienter for the Fund's scheme-liability claim. Although scheme-liability claims under Rule 10b-5(a) and (c) are separate from misrepresentation-and-omission claims under Rule 10b-5(b), the Fund relies on the same factual circumstances to make out both claims in this case. The Fund's showing of scienter is therefore no stronger with respect to the scheme-liability claim than it is for the Rule 10b-5 claim.

### 3. *Analysis of the Helwig factors does not support an inference of scienter*

Moreover, only three of the so-called *Helwig* factors are implicated by the allegations in this case. *See Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001) (en banc), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 317–18, 322–23 (2007). The Fund's allegations relating to the "divergence between internal reports and external statements on the same subject," the second *Helwig* factor, do not provide support for a strong inference of scienter. *See id.* Notably absent from the Amended Complaint is even a single mention of any internal reports by ServiceMaster or Terminix (let alone internal reports concerning the Formosan termite crisis). The closest the Fund comes to alleging anything relevant to this factor is the confidential-witness testimony that Formosan termite-damage claims and Terminix's mitigation efforts were discussed at Steering Committee meetings where Varty and DiLucente were present. Although "the contents of meetings at which senior corporate officers were present [are considered] 'internal reports,'" *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 981 (6th Cir. 2018) (quoting *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 688 (6th Cir. 2005)), the Amended Complaint offers no detail that allows an assessment of whether ServiceMaster's disclosures differed in any significant way from those internal discussions.

Nor does the Amended Complaint show "closeness in time of an allegedly fraudulent

statement or omission and the later disclosure of inconsistent information," the third *Helwig* factor. *See Helwig*, 251 F.3d at 552. A "short turnaround ma[kes] it less likely that the corporation did not know that its statement was misleading." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 484 (6th Cir. 2014). Here, the allegedly inadequate disclosures occurred months apart and followed ServiceMaster's regular quarterly reporting schedule. *See City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 684, 688 (6th Cir. 2005) (finding a one-week span between an allegedly fraudulent statement and a subsequent inconsistent disclosure probative of scienter, but rejecting the same inference when confronted with a gap of more than four months).

The only other relevant *Helwig* factor is "disregard of the most current factual information before making statements," the sixth factor. *See Helwig*, 251 F.3d at 552. But for the reasons discussed above, the factual information that the Defendants purportedly disregarded is insufficient to make the inference of scienter more compelling than the competing nonfraudulent explanation. The tenuous application of the second, third, and sixth *Helwig* factors, together with the complete absence of the rest, supports the conclusion that the Fund has not alleged a strong inference of scienter. *See Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1041–42 (6th Cir. 2016) (holding that there was no strong inference of scienter where seven *Helwig* factors "favor[ed] rejecting a scienter inference" and only "[t]wo *Helwig* factors support[ed] inferring scienter").

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.