RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0014p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────────

ROBERT B. BOYD, an individual,

>    *Plaintiff-Appellant*,

>    *v.*

>    No. 25-1001

NORTHERN BIOMEDICAL RESEARCH, INC., a Michigan corporation; SHANE A. WOODS; DEAN E. HAAN; JOSHUA T. BARTOE; MARK D. JOHNSON,

>    *Defendants-Appellees*.

───────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:22-cv-01185—Robert J. Jonker, District Judge.

Argued:  October 23, 2025

Decided and Filed:  January 15, 2026

Before:  MOORE, BUSH, and DAVIS, Circuit Judges.

───────────────────

## COUNSEL

**ARGUED:**  Matthew T. Nelson, WARNER NORCROSS + JUDD, LLP, Grand Rapids, Michigan, for Appellant.  Gregory G. Timmer, RHOADES MCKEE PC, Grand Rapids, Michigan, for Appellees.  **ON BRIEF:**  Matthew T. Nelson, Brandon J. Cory, Janelle E. Shankin, WARNER NORCROSS + JUDD, LLP, Grand Rapids, Michigan, for Appellant. Gregory G. Timmer, Bruce A. Courtade, Patrick E. Sweeney, RHOADES MCKEE PC, Grand Rapids, Michigan, for Appellees.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.   Robert Boyd wanted to exit from his company.  In 2019, he had sold a majority stake in Northern Biomedical Research, Inc. ("NBR") to the individual defendants in this case:  Shane Woods, Dean Haan, Joshua Bartoe, and Mark Johnson.  He retained a 16% stake in the business but had moved from its headquarters in Michigan to a ranch in Idaho and had grown increasingly frustrated with the management of the company that he started several decades earlier.  At the same time, the individual defendants were seeking to expand.  NBR lacked the cash or revenue to fund that expansion, so the defendants began exploring a potential loan, and they also considered equity financing options.  But they told Boyd little or nothing about these efforts, particularly with respect to the company's interest in equity financing and early overtures from Avista Capital Partners, LLP ("Avista"), the venture capital firm that would wind up taking a 50% stake in NBR.

Boyd sold his shares in December 2020 for about $3.4 million, an amount based on an agreed-upon accounting firm's annual valuation of NBR at roughly $21 million.  The next spring, Avista and NBR entered an agreement for a capital infusion of $40 million, thus valuing the company at $80 million.  Unhappy that he sold his stake in NBR for less than he might have later received, Boyd sued the company and the individual defendants, alleging that their failure to inform him about their discussions with Avista or the fact that NBR was considering private-equity financing violated securities law and breached the defendants' fiduciary duties under Michigan common law.  After discovery, the district court granted summary judgment to the defendants on all counts.  This appeal followed.

We hold that the district court did not err when it granted summary judgment on Boyd's securities-law claims.  But because it applied an incorrect legal standard under Michigan common law, a genuine dispute of material fact remains as to whether Boyd is entitled to relief on Counts III, IV, and V of his second amended complaint.  We therefore affirm in part and reverse in part.

## I.  BACKGROUND

**A.  Factual Background**

In 2019, the individual defendants began talks with Boyd, who they learned was interested in selling his company, NBR.  R. 168-3 (Bartoe Dep. at 21) (Page ID #3717).  On September 1, 2019, their company, BHJW, acquired NBR.  *Id.* at 21–23 (Page ID #3717).  The post-acquisition shareholders of BHJW—the individual defendants along with Boyd and two other NBR employees—entered into a shareholder agreement.  R. 168-45 (Shareholder Agreement at 1) (Page ID #3911).  BHJW, which soon changed its name to Northern Biomedical Research to reflect continuity, had 10,000 outstanding shares, of which Boyd held 1,600.  *Id.*; R. 168-52 (Redemption Docs. at 1) (Page ID #4013); D. 26 (Appellant Br. at 23).[1]  The new NBR owned the company's operations and physical assets, but Boyd himself retained the company's real estate, which NBR leased back from him.  R. 168-46 (Lease at 1–12) (Page ID #3935–47).  Boyd also agreed to extend a $400,000 line of credit to the new company.  R. 168-45 (Shareholder Agreement at 10–11) (Page ID #3920–21).

Boyd's role in the company after the 2019 sale is not entirely clear.  After the acquisition, Haan sent emails to customers stating that Boyd "will continue on as a senior scientific advisor and Chairman of the Board of the new company."  R. 168-11 (Haan Customer Email) (Page ID #3795).  Boyd asserts that he remained as an employee from September 2019 to January 2020.  R. 168-4 (Boyd Dep. at 90–91) (Page ID #3739).  But there "wasn't a great relationship" between Boyd and new management, so in January 2020 Boyd left day-to-day employment at NBR and moved to Idaho.  *Id.* at 91–93 (Page ID #3739); R. 48-1 (Residency Documents) (Page ID #890–94).  Boyd believed, however, that he "more or less" remained chairman of the board of directors.  R. 168-4 (Boyd Dep. at 52–53) (Page ID #3732).  He formally resigned as "an officer, director and employee" of NBR on December 17, 2020, when he sold his stock in the company.  R. 168-13 (Resignation) (Page ID #3800–02); R. 168-52 (Redemption Docs. at 25) (Page ID #4013).

---

[1]To avoid confusion, we refer to both the pre- and post-acquisition companies as NBR throughout.

In the meantime, the individual defendants began to focus on expanding NBR's facilities and operations to allow it to take on more clients because the company was "routinely turning away about twice as much work" as it could actually undertake. R. 168-48 (Bartoe Dep. at 44) (Page ID #3963). Haan led the initial exploration of financing options for such an expansion. *Id.* at 43–44 (Page ID #3963). The directors knew that the costs could run on the scale of tens of millions of dollars. R. 168–47 (Boyd Dep. at 99–102) (Page ID #3959–60).

In June 2020, Haan visited Boyd in Idaho, where they discussed purchasing the facility from Boyd, redeeming Boyd's stock, and financing NBR's expansion. Haan recounted their discussion of financing options, recalling "going over in generalities the options that [he] had explored," which included "senior debt, junior debt, mezzanine debt . . . venture capitalism and private equity." R. 168-2 (Haan Dep. at 76–77) (Page ID #3699–3700). Boyd recalled Haan discussing the possibility of a loan from Mercantile Bank to fund the purchase of his stock, and Boyd then said that he'd told Haan he had "always been . . . against capital venture [sic] investment, that you lose control and you are no longer making the decisions." R. 168-4 (Boyd Dep. at 42–43 (Page ID #3731). Boyd testified that when they discussed financing the facility expansion, Haan had "talked about acquiring a loan" from Mercantile Bank "for that expansion" too. *Id.* at 44 (Page ID #3731). In response to a follow-up question as to whether "Haan sa[id] something about private equity investments," Boyd responded: "I have been consistently against private equity . . . and losing control. And I'm sure that we talked about losing control and control of the company because these people were having managerial conflicts . . . ." *Id.* at 44–45 (Page ID #3731).

Shortly thereafter, Haan and NBR began seeking financing for the expansion in earnest. In an October 22, 2020 email to the NBR shareholders (except for Boyd), Haan sketched out the various options for raising capital, which focused on debt but also referenced the possibility of a private-equity investment. R. 168-19 (Raising Capital Email) (Page ID #3823–26). Haan said he did not send the email to Boyd because he "didn't think of Bob as being part of the company at [that] point in time." R. 168-59 (Haan Dep. at 96) (Page ID #4052). The individual defendants held a meeting on October 23 at which they discussed their capital raise and "Debt vs Equity." R. 168-20 (Meeting Invite) (Page ID #3828). After that meeting, the company began

outreach to a number of potential partners. In November, NBR discussed the possibility of a merger or equity deal with a similar company, Worldwide Primates. R. 168-56 (WWP Email) (Page ID #4034–36). The company also reached out to other potential debt-funding sources including Duneglass Capital and Edgewater Capital. R. 168-48 (Bartoe Dep. at 53–55) (Page ID #3964); R. 168-49 (Haan Dep. at 204–05) (Page ID #3975–76). NBR was still actively considering debt financing from more traditional sources as well; the individual defendants were in conversation with multiple banks with the goal of closing on a loan by the end of 2020. R. 168-21 (Nov. 18 Emails) (Page ID #3832–34).

Amid this scramble for financing, the individual defendants' prior business partner, Rob DeWit, reached out to Haan on behalf of Avista to ask if NBR would be open to taking a meeting so that Avista could "present their company" as a potential funder. R. 168-24 (Initial Avista Emails) (Page ID #3842). Mark Johnson noted in an internal follow-up email that Avista targets companies with a minimum $50 million valuation, and Haan replied that "[i]f you are looking at multiples, we do fall in that mix." *Id.* (Page ID #3841). By December 2, 2020, the two companies had scheduled a call for the next week and exchanged a slide deck (from Avista) for a high level "financial snapshot" (from NBR) that outlined the company's 2020 revenue, EBITDA,[2] and cash on hand. R. 168-25 (Avista Pre-meeting Emails) (Page ID #3843–46). After sharing NBR's financials, Haan recognized that he should have gotten an NDA in place, and the parties signed an NDA on December 7. R. 168-27 (NDA Emails) (Page ID #3850–52); R. 168-49 (Haan Dep. at 151) (Page ID #3973).

The individual defendants had an hour-long introductory call with Avista on December 8. R. 168-57 (Woods Dep. at 103–04) (Page ID #4039). On December 14, Avista learned through DeWit that Haan and NBR were "ready to take the next step with Avista for building a relationship," with the possibility of Avista "acquiring the amount of [Boyd's] shares . . . , assisting with costs of expansion and providing some managerial support." R. 168-29 (Dec. 14 Emails at 2) (Page ID #3861). Rob Girardi of Avista responded to DeWit that he "discussed the

---

[2]EBITDA stands for "earnings before interest, taxes, depreciation, and amortization," which is used as "a standardized measure of a company's profitability." *Teamsters Local 237 Welfare Fund v. ServiceMaster Global Holdings, Inc.*, 83 F.4th 514, 520 (6th Cir. 2023).

deal last week with [Avista's] investment committee, and the upshot [was] that I think Avista would need control (over 50% ownership) to invest in the company." *Id.* DeWit replied that it was "[u]nlikely" NBR would agree to give up 50%. *Id.* Girardi nevertheless planned to "reach out to Dean [Haan] to schedule a conversation." *Id.* That call—the next direct contact between Avista and NBR—took place on December 18 and included Haan, Girardi, and Garrett Lustig, another Avista representative. R. 168-58 (Lustig Dep. at 186–87) (Page ID #4046); *see also* R. 168-30 (Dec. 21 Email) (Page ID #3864) (referring to "our call on Friday").[3] Avista told Haan that "50 percent ownership was important to us" and discussed a "strawman proposal" for a $30- to $35-million investment. R. 168-58 (Lustig Dep. at 188) (Page ID #4046). At the time, the $30- to $35-million number was based not on Avista's due diligence but on Haan's estimate of how much NBR's expansion would cost. *Id.* at 188–89 (Page ID #4046). On December 21, the Monday after the call, Lustig sent Girardi a list of "high priority diligence requests." R. 168-30 (Dec. 21 Lustig Email) (Page ID #3864).

At the same time that NBR was searching for financing, it was negotiating with Boyd over the sale of his shares. Shortly after Haan's Idaho trip, attorneys for NBR and Boyd began preparing documents for the redemption of Boyd's stock. R. 168-72 (Initial Redemption Emails) (Page ID #4167–71). In September, the parties exchanged a recent valuation of $21,244,000 by Rehmann, the accounting firm designated by the shareholder agreement to set the redemption price. R. 168-73 (Follow-up Redemption Emails) (Page ID #4178); R. 168-33 (Rehmann Valuation at 1) (Page ID #3871); R. 168-45 (Shareholder Agreement at 6) (Page ID #3916). The negotiations then stalled until December. R. 168-73 (Follow-up Redemption Emails) (Page ID #4173–74). They started back up when NBR held its annual shareholder meeting on December 4, 2020. R. 168-51 (Shareholder Meeting Minutes) (Page ID #3986). Boyd attended the meeting, and the items discussed included the company's financials and Boyd's pending buyout, but not NBR's search for financing. *Id.* The individual defendants were clear that they wanted to avoid discussing expansion financing with Boyd, and neither debt financing nor Avista's outreach came up at the meeting. *Id.*; R. 168-21 (Nov. 18 Emails) (Page ID #3833).

---

[3]The last Friday before Monday, December 21, 2020 was December 18, 2020.

Boyd executed the agreement for the redemption of his 1,600 shares on December 17, 2020, at a price of $3,399,040, which reflected the Rehmann valuation. R. 168-52 (Redemption Docs. at 1) (Page ID #4013). When Boyd signed the agreement, he filled in that day's date such that the agreement reads: "This Stock Redemption Agreement (this "**Agreement**") is entered into effective as of Dec. 17, 2020 ("**Closing Date**"), by and between Robert B. Boyd (**"Seller"**) [and] Northern Biomedical Research, Inc." *Id.* (emphasis in original). Boyd's attorney returned the agreement to NBR on December 21, 2020. R. 168-32 (Dec. 21 Redemption Emails) (Page ID #3868).

Over two months after Boyd sold his shares, Avista sent NBR its first proposed term sheet, which provided for a $32.5 million investment in NBR in exchange for a 50% share in the company. R. 168-37 (Feb. Term Sheet) (Page ID #3888). NBR countered on March 8, and asked Avista for $54 million. R. 168-39 (March NBR Response) (Page ID #3897). Avista replied with an offer of $40 million. R. 168-42 (March Avista Proposal) (Page ID #3904). At an April 21, 2021, shareholder meeting, NBR was still considering whether to take out a loan or accept Avista's terms after negotiations with Avista had progressed much further. *See* R. 168-17 (Apr. 2021 Shareholder Materials) (Page ID #3814–18). In the end, NBR's shareholders voted for the Avista deal, which closed at $40 million. R. 168-3 (Bartoe Dep. at 122–23) (Page ID #3723).

**B. Procedural History**

Boyd sued NBR and the individual defendants in the United States District Court for the Western District of Michigan on December 13, 2022. R. 1 (Compl.) (Page ID #1). He eventually filed his second amended complaint, which is operative here, on April 5, 2023. R. 48 (Second Am. Compl.) (Page ID #852). The second amended complaint contains seven counts:

- Count I: Violation of Section 10(b) of the Exchange Act and Securities and Exchange Commission Rule 10b-5 (against all defendants).

- Count II: Violation of the Michigan Uniform Securities Act of 2002 (against all defendants).

- Count III: Violation of common-law fiduciary duties (against individual defendants).

- Count IV: Fraudulent misrepresentation/fraudulent omission/fraudulent inducement as to redemption agreement (against all defendants).

- Count V: Fraudulent misrepresentation/fraudulent omission/fraudulent inducement as to mutual release (against all defendants).

- Count VI: Breach of representation (against NBR).

- Count VII: Indemnification (against NBR).

R. 48 (Second Am. Compl. ¶¶ 102–249) (Page ID #867–87). The defendants moved to dismiss the second amended complaint for failure to state a claim. R. 52 (Motion to Dismiss) (Page ID #1060). The district court denied the motion, finding as to the securities-law claims that "it is more than enough to allege that fellow board members and shareholders disclosed many business matters to Boyd but never once mentioned that the company was actively seeking a major capital infusion and had actually begun talks with the eventual contributor of $40,000,000 the same month the company consummated the stock redemption." R. 64 (MTD Op. at 6) (Page ID #1302). The court also found Boyd's allegations "sufficiently support[ed] the existence and breach of a fiduciary duty." *Id.* at 7 (Page ID #1303).

The defendants answered the second amended complaint, and the case proceeded to discovery. R. 72 (Ans.) (Page ID #1464–1531). Both Boyd and the defendants moved for summary judgment. R. 103 (Boyd MSJ) (Page ID #1681–1718); R. 126 (Defs.' MSJ) (Page ID #3066–67).

The district court, after argument, granted the defendants' motion for summary judgment on all counts. R. 169 (Op. & Order at 19) (Page ID #4201). It first considered Boyd's Section 10(b) claim, finding that the omissions were not material under the precedent interpreting Section 10(b) and Rule 10b-5. *Id.* at 9–15 (Page ID #4191–97). The court then turned to Boyd's claim that the defendants violated their common-law fiduciary duties. Although the district court determined that Michigan law governed these claims, it relied on Delaware precedent and applied the federal materiality standard, reaching the same result of no materiality. *Id.* at 15–18 (Page ID #4197–4200). The district court entered judgment in favor of the defendants, and this appeal followed. R. 170 (Judgment) (Page ID #4202); R. 171 (Notice of Appeal) (Page ID #4203).

## II. ANALYSIS

### A.  Standard of Review

We review a district court's grant of summary judgment de novo.  *Wilmington Tr. Co. v. AEP Generating Co.*, 859 F.3d 365, 370 (6th Cir. 2017).  "Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Id.* (quoting *Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 526 (6th Cir. 2014)).  "A 'genuine dispute' exists if the nonmoving party presents 'sufficient evidence from which a jury could reasonably find' in its favor."  *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1230 (6th Cir. 2025) (quoting *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 481 (6th Cir. 2020)).  In determining whether such a dispute exists, we "draw all reasonable inferences in favor of [Boyd], the non-moving party."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 482 (6th Cir. 2008) (quoting *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 560 (6th Cir. 2004)).

### B.  The Defendants' Omissions

All of Boyd's claims rest on an omissions-based theory, i.e., that the defendants neglected to inform him of facts that the law required them to disclose under the circumstances. To determine whether he may prevail on any omissions-based claim, we must first determine what information the defendants kept from him.  Boyd alleges three such omissions wrongfully affected his decision to sell his shares:  "(1) Defendants were pursuing [private-]equity investments; (2) Avista had approached Defendants about making an equity investment in Northern Biomedical without solicitation by Defendants; and (3) Avista's interest, and its suggested deal structure, implied a share value that was significantly greater than the Rehmann valuation."  D. 26 (Appellant Br. at 30).  The defendants acknowledge that they neglected to tell Boyd about Avista, and therefore concede the second omission on his list.  D. 31 (Appellee Br. at 33) (noting that "Boyd may not have been aware that Avista had approached" NBR).  They do, however, argue that there is no genuine dispute of material fact as to whether the first or third alleged omissions may form a basis of Boyd's claims.  The first, they tell us, is belied by Boyd's own deposition testimony regarding Haan's June 2020 visit to Idaho.  *Id.* at 35.  And the third,

they argue, is precluded by the fact that Avista communicated the proposed deal structure to NBR on December 18, 2020, *after* the effective date of Boyd's sale. *Id.* at 40. We address each issue in turn.

Because Boyd was otherwise out of the loop as to NBR's search for financing, the question of whether Boyd knew NBR was considering private-equity investment comes down to what Haan disclosed during his trip to Idaho. Haan, in his deposition testimony, recounted that he told Boyd—at least at a high level of generality—that NBR was considering both debt and equity financing to fund the planned expansion. R. 168-2 (Haan Dep. at 76–77) (Page ID #3699–3700). The question is then whether Boyd's own deposition testimony is sufficient to create a genuine dispute of material fact. To answer that question, we examine Boyd's relevant testimony in full:

> Q: So did Mr. Haan, for instance, did he tell you that the company was considering a private equity investment?
>
> A: I think in the discussions about moving forward I have always been, even at the old company, against capital venture investment, that you lose control and you are no longer making the decisions, and accountants are making the decisions rather than scientists, and so that's always been my general opinion.
>
> \* \* \*
>
> Q: And the – it sounds like, am I correct, Mr. Haan talked to you in the first instance about funding from Mercantile Bank to purchase your stock, and then in the second instance did he not talk about funding from Mercantile Bank to build out the other – the remaining unconstructed portions of the Pontaluna facility?
>
> A: He talked about acquiring a loan for that expansion.
>
> Q: And did – did Mr. Haan suggest to you in his discussions that the funding for the expansion of the Pontaluna facility would potentially involve private equity?
>
> A: He said that it was going to be a loan from Mercantile Bank, specifically.
>
> Q: I'm just trying to figure out how this – this reference to private equity or venture capital investments came up. Did Mr. Haan say something about private equity investments?
>
> MR. CORY: Object to the form, misstates the record.
>
> A: I have been consistently against private equity or borrowing money – not borrowing money, but receiving money for stock and losing control. And I'm sure that we talked about losing control and control of the company because these

> people [the individual Defendants] were having managerial conflicts and there was no central control in that company at that time.
>
> Q:  And is it fair to state that because you counseled Mr. Haan against searching out private equity investments, you knew that in order to expand the facility at Pontaluna private equity investments was going to be considered?
>
> MR. CORY:  Object to form, misstates testimony.
>
> A:  That's your opinion.
>
> Q:  I'm asking what your opinion is, sir.
>
> A: My opinion is what Dean Haan testified to.  He said he was getting a loan for both.  And that's why I believe that he wanted my note.  That's my guess.
>
> Q:  How did your disdain for private equity investments come – how did that topic come up in the conversation?
>
> MR. CORY:  Object to the foundation.
>
> A:  I don't remember specifically.  We were fishing.  Mushroom hunting.

R. 168-4 (Boyd Dep. at 42–45) (Page ID #3731).  Two sets of statements are relevant in sorting out this testimony.  First are Boyd's answers that "[Haan] talked about acquiring a loan for that expansion," "that it was going to be a loan from Mercantile Bank, specifically," and that "[Haan] said he was getting a loan for both" the expansion and NBR's purchase of Boyd's stock.  *Id.* at 44–45 (Page ID #3731).  Second is Boyd's language with respect to the issue of whether private equity came up.  Boyd said in the deposition that he was "sure that [he and Haan] talked about losing control," and that "losing control" meant "not borrowing money, but receiving money for stock"—i.e., equity investment.  *Id.* at 45 (Page ID #3731).

We hold that Boyd has established a genuine dispute of material fact as to whether Haan disclosed that NBR might pursue private-equity financing.  Boyd's testimony leaves no room for doubt that the topic of private equity came up, perhaps briefly, during Haan's visit.  Just seconds before Boyd said he was "sure that we talked about losing control," he made his understanding of that phrase clear:  "I have been consistently against *private equity* . . . receiving money for stock *and losing control*."  *Id.* (emphasis added).  And earlier in the line of questioning he said that when a company takes venture-capital investment "you lose control and are no longer making the decisions."  *Id.* at 42 (Page ID #3731).  His claim that all he was referring to with the phrase "losing control" was NBR's "fractured leadership" cannot withstand scrutiny.  *See* D. 34

(Reply Br. at 14–15). But we may still reasonably infer from Boyd's testimony that the limited discussion of private equity during the Idaho trip did not arise in response to Haan informing him that NBR planned to seek an equity investment. A finder of fact could determine that Boyd was proactively sharing his disdain for venture capital in the context of a general discussion of financing pathways and the specific mention of debt financing from Mercantile Bank. This version of the story—that Haan did not tell Boyd that NBR was pursuing private equity—is consistent with the fact that Haan's email to NBR's other shareholders describing potential financing options in more detail did not go out until October (four months after the Idaho meeting), and no actual pursuit of equity financing occurred until after that email. R. 168-19 (Raising Capital Email) (Page ID #3822–26); R. 168-56 (WWP Email) (Page ID #4034–36); R. 168-48 (Bartoe Dep. at 53–55) (Page ID #3964); R. 168-49 (Haan Dep. at 205) (Page ID #3976). We therefore part ways with the district court and hold that there remains a genuine dispute of material fact as to whether Haan (or anyone else at NBR) told Boyd that the company was pursuing equity financing opportunities.

The next issue—the third omission on Boyd's list—comes down to timing. Boyd argues that we may consider as an omission the defendants' failure to inform him of the "strawman proposal" that Avista and NBR discussed on a December 18, 2020 phone call. R. 168-58 (Lustig Dep. at 188–89) (Page ID #4046). That call laid out the basic sort of terms that Avista sought in its acquisition, including 50% ownership and a potential investment of $30 to $35 million. *Id.* But Boyd's claims all depend on the duties that the defendants owed him in his capacity as a shareholder, and he recognizes that this depends on the date upon which the sale "closed" and his shares were "redeemed." D. 34 (Reply Br. at 3). If he was not a shareholder on December 18, then any omission occurring on that date cannot form a basis of this suit.

The parties' stock-redemption agreement resolves this question in the defendants' favor. It provides: "This Stock Redemption Agreement (this "**Agreement**") is entered into effective as of Dec. 17, 2020 ("**Closing Date**"), by and between Robert B. Boyd (**"Seller"**) [and] Northern Biomedical Research, Inc." R. 168-52 (Redemption Docs. at 25) (Page ID #4013) (emphasis in original). We "must discern the parties' intent from the words used in the contract and must enforce an unambiguous contract according to its plain terms." *Davis v. LaFontaine Motors,*

*Inc.*, 719 N.W.2d 890, 894 (Mich. Ct. App. 2006). The contract's use of "effective" and "closing date" with reference to December 17, 2020, designates *that* date as the one upon which the parties' rights and obligations pursuant to the contract took effect. *See Effective,* Black's Law Dictionary (12th ed. 2024) ("(Of a statute, order contract, etc.) in operation at a given time . . . . A statute, order, or contract is often said to be effective beginning (and perhaps ending) at a designated time."); *Closing*, Black's Law Dictionary (12th ed. 2024) ("The consummation of a deal or transaction[.]"). And Michigan law is clear that although "[a] contract is generally *executed . . .* by signing and delivering it," *In re Estate of Koch*, 912 N.W.2d 205, 212 n.5 (Mich. Ct. App. 2017) (emphasis added), parties may incorporate language into a contract that renders it *effective* prior to the date of execution, *Opera Block Props., Inc. v. Auto-Owners Ins. Co.*, --- N.W.3d ---, ---; 2024 WL 3907171, at *7 (Mich. Ct. App. Aug. 22, 2024) (discussing an insurance policy that was amended on February 6, but by its own terms bound the parties on February 5). While Michigan's Supreme Court has not expressly articulated this principle, we do not hesitate to apply what amounts to the long-prevailing common-law view. *See, e.g.*, *Am. Cyanamid Co. v. Ring*, 286 S.E.2d 1, 3 (Ga. 1982) ("[T]he effective date of a contract is not the date of execution where the contract expressly states that its terms are to take effect at an earlier date."); *Monahan v. Fid. Mut. Life Ins. Co.*, 148 Ill. App. 171, 174 (Ill. Ct. App. 1909) ("In the law of contracts, it is elementary that ordinarily a contract speaks from the day of its date, regardless of when it was executed and delivered."); 2 Williston on Contracts § 6:79 (4th ed. 2025) ("[I]t seems clear that, where the parties themselves agree that a contract between them should be given effect as of a specified date, absent the intervention of third-party rights, there is no sound reason why that agreement should not be given effect."). We accordingly look not to the date of the contract's execution, but to the effective date as agreed to by the parties to determine Boyd's rights. And because, by the agreement's plain terms, he sold his shares effective December 17, he may not rely on events after that date—including Avista's disclosures on the December 18 phone call—in support of his legal claims.

To be sure, Boyd may now regret his designation of December 17 as the contract's effective date. Because his attorney did not deliver the contract to NBR until December 21, there was a period after Boyd formalized his decision to sell but before the contract was executed during which he could, in theory, have revoked his assent by not delivering it. While there is an

element of unfairness to the situation, we must consider the contract that Boyd in fact agreed to, not the one he wishes he did.  To hold otherwise would, first and foremost, run contrary to Michigan law.  In *Opera Block*, the defendant insurer amended the plaintiff insured's policy to include coverage for drain backups, formally changing the insurance contract at 10:11 a.m. on February 6, but "backdat[ing] the changes to 12:01 a.m., February 5."  2024 WL 3907171, at *1. The plaintiff discovered a drain backup "[i]n the early morning hours of February 6," before the insurance policy had been updated.  *Id.*  Like Boyd, the insurer in *Opera Block* would have preferred to avoid the plain terms of its agreement and therefore escape liability for the property damage.  The Michigan Court of Appeals held, however, that the plaintiff was entitled to summary judgment "[b]ecause the loss occurred after the effective date" of the updated policy. *Id.* at *7.  Focusing the inquiry on the effective date, rather than the date of execution, also accords with the maxim that "[t]he intent of the parties is to be gathered from the four corners of the instrument."  *Rogers v. Great N. Life Ins. Co.*, 279 N.W. 906, 908 (Mich. 1938).

In sum, we proceed by considering the law as it applies to two omissions:  (1) the defendants' failure to tell Boyd that NBR planned to seek equity financing; and (2) the defendants' failure to inform Boyd that Avista had expressed interest in NBR and the companies had an introductory meeting before Boyd sold his shares on December 17.

## C.  Michigan Common-Law Claim

### 1.  Legal Standard

We begin where the parties focus most of their attention in this appeal:  Boyd's claim in Count III that the individual defendants violated their fiduciary duties to him under Michigan common law.  The parties agree that under Michigan common law—separate from any duties arising under Michigan's statutory securities law—corporate directors owe a fiduciary duty to a corporation's shareholders.  D. 31 (Appellee Br. at 23); D. 26 (Appellant Br. at 34); *Murphy v. Inman*, 983 N.W.2d 354, 362 (Mich. 2022).  They disagree, however, about the nature of that fiduciary duty.  Appellees defend the district court's holding that Delaware law, which in turn incorporates a federal materiality standard, governs their fiduciary duty to Boyd.  D. 31 (Appellee Br. at 23–24); *see* R. 169 (Op. & Order at 15–16) (Page ID #4197–98).  Boyd, on the

other hand, argues that Michigan common law imposes "a heightened fiduciary obligation" upon directors of a closely held corporation, one "more akin to partnership law." D. 26 (Appellant Br. at 35) (quoting *Estes v. Idea Eng'g & Fabrications, Inc.*, 649 N.W.2d 84, 91 (Mich. Ct. App. 2002)).

When applying state law, we "must follow the controlling decision of the highest state court." *Am. Tooling Ctr. Inc. v. Travelers Cas. & Sur. Co. of Am.*, 895 F.3d 455, 460 n.1 (6th Cir. 2018). If no such decision controls, we "follow a decision of the state appellate court, published or unpublished," unless we are "'convinced . . . that the highest court of the state would decide otherwise.'" *Id.* (quoting *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 517 (6th Cir. 2001)).

Taken together, the law as expressed by the Michigan Supreme Court and Court of Appeals supports Boyd's proposed materiality standard. In *Murphy*, the Michigan Supreme Court outlined corporate directors' fiduciary duty, which requires them to "exercise candor toward the corporation's shareholders and [to] disclose all material facts within their knowledge that may influence shareholder action." 983 N.W.2d at 362–63; *see also id.* at 363 n.31 (quoting *Reed v. Pitkin*, 204 N.W. 750, 752 (Mich. 1925)) (noting that director "was bound to disclose to [shareholders] all facts within his knowledge which were or might have been material to them, or which might influence them in their action."). This expectation of candor "depend[s] heavily upon context." *Id.* at 363. *Murphy* involved "directors' fiduciary duties to their shareholders in sale-of-control transactions[.]" *Id.* Although the *Murphy* court did not directly incorporate Delaware law on this issue, it noted that "the opinions of [Delaware] courts on such matters may be persuasive," and, in that case "provide[d] meaningful guidance." *Id.* at 363 & n.33. In *Estes*, the Michigan Court of Appeals addressed the fiduciary duties that apply to directors in the context of a closely held corporation, holding that such a context "requires a higher standard of fiduciary responsibility, a standard more akin to partnership law." 649 N.W.2d at 91. Michigan partnership law, in turn, imposes a duty of "full and frank disclosure of all relevant information" such that "[e]ach partner . . . is required to make full disclosure of all material facts within his knowledge in any way relating to the partnership affairs." *Band v. Livonia Assocs.*, 439 N.W.2d 285, 294 (Mich. Ct. App. 1989). In sum, *Murphy* and *Estes* are best read as imposing a relatively

demanding fiduciary duty of candor upon directors of a closely held corporation. Directors must "disclose all material facts within their knowledge that *may* influence shareholder action." *Murphy*, 983 N.W.2d at 362–63 (emphasis added). The extent of that duty "depend[s] heavily upon context," *id.* at 363, but the context here supports a finding of a "higher standard of fiduciary responsibility," *Estes*, 659 N.W.2d at 91.

The defendants request that we follow the district court's path and rely instead on Delaware law, but their arguments fall short. *See* D. 31 (Appellee Br. at 23–24). Delaware courts, in determining whether directors have "met [their] duty of complete candor," apply a materiality standard derived from federal securities law. *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 945 (Del. 1985) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Under that standard, "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Id.* at 944 (quoting *TSC*, 426 U.S. at 449). We might find good reason to apply such a standard if Michigan law were a blank slate. But it is not. On the contrary, the decisions of the Michigan courts conflict with the *TSC* standard. Most crucially, federal securities law requires a "substantial likelihood" that an omission would affect shareholder behavior, *TSC*, 426 U.S. at 449, but *Murphy*'s duty of candor defines materiality as encompassing any information that "may influence" shareholders, 983 N.W.2d at 363; *see also Reed*, 204 N.W. at 752 (outlining duty to disclose facts which "might have been material to" or "might influence" shareholders). Nor does the *TSC* standard consider context in the same way that Michigan law does and apply a heightened duty where a corporation is closely held. *See Murphy*, 983 N.W.2d at 363; *Estes*, 649 N.W.2d at 91.

All told, we do not disagree that "the opinions of [Delaware] courts . . . may be persuasive" on matters of corporate law. *Murphy*, 983 N.W.2d at 363 n.33. But that does not give us license to rely on Delaware law to displace well-settled Michigan common law. We therefore depart from the district court's reasoning and apply Michigan's higher standard of fiduciary duty to Count III of Boyd's complaint.

**2. Application**

As described above, the omissions at issue are NBR's pre-December 17 communications with Avista and NBR's interest in private-equity financing.  Boyd argues that "[a] reasonable juror could conclude that . . . the Avista inquiry was the sort of disclosure that might have been material to Boyd's decision to sell his stock." D. 26 (Appellant Br. at 44).  The defendants argue that these omissions were not material, but they address only the federal "substantial likelihood" standard.  *See* D. 31 (Appellee Br. at 37–39).  That is, the defendants do not argue they would prevail under the lower materiality standard that we hold applies.

Applying the correct standard, a jury could reasonably find that Boyd was entitled to know about NBR's consideration of equity financing and Avista's interest in NBR.  Even though the relationship with Avista had not crossed over into negotiations or even due diligence by the time Boyd sold his shares, the private-equity firm's interest is the sort of thing that *might* have affected his calculus as a minority shareholder.  Avista's willingness to engage with NBR after seeing its top-line financials, although far from a sure thing, introduced at least the possibility of an investment that would value the firm at over $50 million, more than double the value at which Boyd planned to sell.  A finder of fact could reasonably determine it to be the sort of information that "may influence shareholder action." *Murphy*, 983 N.W.2d at 363.  By the same token, a jury could find that by concealing their engagement with Avista and consideration of equity investment, the individual defendants violated their partnership-like obligation of "full and frank disclosure," one "connoting not mere honesty but the punctilio of honor most sensitive." *Band*, 439 N.W.2d at 294 (quoting 59A Am. Jur. 2d Partnership § 420).  Summary judgment was therefore not warranted on Count III.

**D.  Securities-Law Claims**

**1.  Legal Standard**

A securities-fraud suit under Section 10(b) and Rule 10b-5 has six elements:  "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives,*

*Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).  The parties' arguments on appeal involve only the first element, and only in the omissions context.

As we described in *In re Omnicare, Inc. Securities Litigation*, 769 F.3d 455 (6th Cir. 2014), the first element of a securities-fraud claim comprises two distinct parts.  The first is whether an omission is actionable, or, put differently, whether a person has a "duty to disclose" information under the circumstances.  *Id.* at 471.  A duty to disclose may arise when "a person or corporation comes into possession of information that makes a prior statement 'inaccurate, incomplete, or misleading.'"  *Id*. (citation modified).  That is, sometimes the securities laws require disclosure to set the record straight after a prior statement is called into question.  But there are also affirmative duties to disclose where, for example, there is insider trading, a statute requiring disclosure, or a fiduciary relationship.  *Id.*; *see also Chiarella v. United States*, 445 U.S. 222, 227–28 (1980).

The second part of the first element of a securities-fraud claim is materiality.  *Omnicare*, 769 F.3d at 471–72.  "[A]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important" in guiding his or her action.  *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988) (quoting *TSC*, 426 U.S. at 449).  "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Id.* at 231–32 (quoting *TSC*, 426 U.S. at 449).

### 2.  Actionability

To the extent that the parties contest whether the omissions are actionable, Boyd has the stronger side of the argument.  The district court relied on cases from this court to find that to point to an actionable omission, Boyd must show that the defendants possessed information "that ma[de] a prior statement 'inaccurate, incomplete, or misleading.'"  R. 169 (Op. & Order at 9) (Page ID #4191) (quoting *Murphy v. Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401 (6th Cir. 1997)).  But those cases present an incomplete picture.  A duty to disclose under Section 10(b)— i.e. the circumstances necessary for an actionable omission—may also arise where one party has

a fiduciary duty to or other relation of trust with another. *Chiarella*, 445 U.S. at 228. Federal courts have recognized that such a relation of trust exists in this exact circumstance—that of "[c]lose corporations buying their own stock." *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 435 (7th Cir. 1987); *see also Greening v. Litton Indus. Automation Sys., Inc.*, 53 F.3d 331, 1995 WL 94743, at *3 (6th Cir. 1995) (Table) (per curiam) ("As Lamb was a closely-held corporation, it had a duty to disclose to Greening, as both an investor and employee, material ongoing negotiations for a merger with Litton, even though the price and structure of the deal had not been resolved.").

Appellees insist, on the other hand, that "[s]ilence in itself is not misleading under Rule 10b-5." D. 31 (Appellee Br. at 52) (citing *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 569 (6th Cir. 2004)) (emphasis omitted). But they miscite *Ford*, which in fact states "[s]ilence, *absent a duty to disclose*, is not misleading under Rule 10b-5." 381 F.3d at 569 (quoting *Basic*, 485 U.S. at 239 n.17) (emphasis added). As just outlined, the law is clear that a fiduciary relationship, such as among directors and shareholders of a closely held corporation, may create such a duty. *Chiarella*, 445 U.S. at 228–29. Accordingly, the defendants' failure to disclose information relevant to NBR's purchase of Boyd's stock was actionable.

### 3. Materiality

While *TSC* provides the governing standard at the highest level of generality, the *Basic* framework guides our inquiry here. That is because this is a case about omissions relating to "contingent or speculative information or events"—i.e., (1) the possibility that NBR might secure equity financing, and (2) that it might strike an equity deal with Avista in particular. *Basic*, 485 U.S. at 238. In cases like this, "materiality 'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'" *Id.* (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968)). When the "event" at issue is a merger or acquisition, "the most important event that can occur in a small corporation's life, . . . inside information . . . can become material at an earlier stage than would be the case as regards lesser transactions—and this even though the mortality rate of mergers in such formative stages is doubtless high." *Id.* (quoting *SEC v. Geon Indus., Inc.* 531 F.2d 39, 47–48 (2d Cir. 1976)).

Courts assess the probability of an event by looking to "indicia of interest in the transaction at the highest corporate levels," including, for example "board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries[.]" *Id.* at 239.

We start with the defendants' failure to disclose their contact with Avista.[4] Applying *Basic*'s framework in a similar case, we noted that "[t]he mere fact that a company has received an acquisition overture or that some discussion has occurred will not necessarily be material." *Filing v. Phipps*, 503 F. App'x 297, 299 (6th Cir. 2012) (quoting *Glazer v. Formica Corp.*, 964 F.2d 149, 155 (2d Cir. 1992)). In *Filing*, a competitor contacted the director of a closely held corporation to express an interest in acquiring it. *Id.* at 298. After that overture, but before formal negotiations or consummation of a purchase, the plaintiff sold his shares in the company. *Id.* Looking to *Basic*, we recognized that "an acquisition is often the most important event in the life of a closely held corporation," but determined that the informal pre-negotiation discussions among principals were not material. *Id.* at 299–300; *cf. Greening*, 1995 WL 94743, at *2. The decision in *Filing* accords with the law in other circuits as to when the possibility of an acquisition or merger typically becomes material. *See, e.g.*, *Taylor v. First Union Corp. of S.C.*, 857 F.2d 240, 244 (4th Cir. 1988) (merger discussions not material where "[t]here was no agreement as to the price or structure of the deal" and parties had simply agreed "to establish a relationship"); *Jackvony v. RIHT Fin. Corp.*, 873 F.2d 411, 415 (1st Cir. 1989) (possibility of acquisition not material where there were "no concrete offers, specific discussions, or anything more than vague expressions of interest").

These cases tell us that the defendants' failure to disclose information about Avista's interest was not material as of December 17, even viewing the facts in the light most favorable to Boyd. In terms of magnitude, a transformative investment in exchange for 50% of a company's equity is not meaningfully different from an event like a merger or acquisition. Like a merger or

---

[4]Because the district court concluded that Boyd knew about NBR's pursuit of private-equity financing, it did not address whether the failure to disclose this information was material. But, even without remand, in cases of de novo review that involve "only application of legal propositions to the undisputed facts in the record, we may affirm on any grounds supported by the record even if different from the reasons of the district court." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002).

acquisition, this sort of sale is among "the most important event[s] that can occur in a small corporation's life." *Basic*, 485 U.S. at 238 (quoting *Geon Indus.*, 531 F.3d at 47).[5] But *Basic* tells us we must look also to "the probability that the event will occur" at the time of the alleged omissions. *Id.* at 239 (quoting *Texas Gulf Sulphur Co.*, 401 F.2d at 849). And the probability of a major investment by Avista was extremely speculative on December 17 as far as the defendants knew. All that had occurred to that point was Avista's initial outreach, the exchange of top-line business information, and the execution of a non-disclosure agreement. Though NBR was "ready to take the next step with Avista for building a relationship" as early as December 14, those next steps did not actually take place until after Boyd sold his shares. R. 168-29 (Dec. 14 Emails) (Page ID #3861). And it was only on December 18, after the redemption, that even the most basic contours of a potential deal became apparent. R. 168-58 (Lustig Dep. at 188–89) (Page ID #4046). Prior to that point, NBR expected that any investment would occur at a lesser scale. R. 168-29 (Dec. 14 Emails at 1) (Page ID #3861) (NBR was open to Avista "acquiring the amount of [Boyd's] shares . . . , assisting with costs of expansion and providing some managerial support."). And none of the "indicia of interest" that *Basic* tells us to consider, such as "board resolutions" or "instructions to investment bankers," existed prior to December 17. *Basic*, 485 U.S. at 239. Under these circumstances, the mere agreement "to establish a relationship" between NBR and Avista was not material information under federal securities law. *Taylor*, 857 F.2d at 244.[6]

NBR's consideration of equity financing as an option as a general matter was likewise highly uncertain as of December 17, 2020. Even taken in the light most favorable to Boyd, the evidence demonstrates that equity financing was a secondary strategy that NBR was considering alongside its pursuit of a loan to cover its expansion costs. Haan's October 22 email shows as much. On the first page of the memo he attached, he summarizes five "capital companies," including Duneglass Capital, Edgewater Capital, and Charter Capital, which had "indicated that

---

[5]Not every outside investment will be of similar magnitude under *Basic*. Many companies may engage in repeated, smaller financing rounds that do not fundamentally change the character of their operations or valuation.

[6]We do not impose a bright-line rule that an acquisition or investment overture may never cross the threshold of materiality prior to the commencement of formal negotiations between the target and investor. There may be some circumstances in which such communications render the "probability that the event will occur" so high as to meet the federal materiality standard. *Basic*, 485 U.S. at 238. But this is not such a case.

NBR, based on their initial review, would be in a strong position to *borrow funds without giving up equity*." R. 168-19 (Raising Capital Email at 2) (Page ID #3824) (emphasis added). After that, Haan described options including "Senior lending institutions," "junior or mezzanine debt," "equity or venture capital," "government loans," and a "private raise." *Id.* at 2–3 (Page ID #3824–25). All told, Haan spent just five lines of a two-page single-spaced document on the possibility of equity financing. Furthermore, before December 17, NBR had preliminary discussions with just one other potential equity partner: Worldwide Primates. R. 168-56 (WWP Email) (Page ID #4035–36). But there is no evidence that the Worldwide Primates discussions ever proceeded beyond the stage of informal internal discussions, *see* R. 168-2 (Haan Dep. at 125–26) (Page ID #3704), and NBR was still actively pursuing debt financing from both non-traditional funders and banks when Boyd sold his shares, R. 168-48 (Bartoe Dep. at 53–55) (Page ID #3964); R. 168-49 (Haan Dep. at 205) (Page ID #3976); R. 168-21 (Nov. 18 Emails) (Page ID #3832–34). Indeed, NBR was still considering debt financing as late as April 21, 2021, after negotiations with Avista had progressed much further. *See* R. 168-17 (Apr. 2021 Shareholder Materials at 3–7) (Page ID #3814–18).

These facts cannot support a finding of a material omission under *Basic*. To be sure, courts have found that a closely held "company's intention to merge or undertake other restructuring" may be material where it "has moved beyond its incipient stages and ripened into purposeful action[.]" *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 182 (2d Cir. 2001); *see also Finnerty v. Stiefel Lab'ys, Inc.*, 756 F.3d 1310, 1318, 1321 (11th Cir. 2014) (finding potential securities-fraud violation where, unbeknownst to shareholders, company "considered itself to be a serious acquisition target," and had begun "serious talks with a potential acquirer"). But the evidence here does not show that NBR's consideration of an equity investment was anything more than incipient. Especially considering the company's continuing search for debt financing, its actions did not, as of December 17, manifest a clear intention to take on a large private-equity investment.

The defendants' actions, particularly their exclusion of Boyd from the company's financing discussions, certainly fall short of the standard of transparency one would expect in a well-functioning business. But our task is to apply federal securities law, not to provide

management advice. Because disclosure of Avista's outreach and the fact that NBR was considering equity financing would not have "significantly altered the 'total mix' of information made available" to Boyd, we affirm the district court's judgment on Count I. *Basic*, 485 U.S. at 232 (quoting *TSC*, 426 U.S. at 449).

**E. Remaining Claims**

Briefing in this case focused almost exclusively on Boyd's Michigan common-law claim for breach of fiduciary duty (Count III) and his federal securities-fraud claim (Count I). Those claims are addressed above. But Boyd's complaint included seven counts, and we must address them all.

First among those other counts is Count II, Boyd's claim under the Michigan Uniform Securities Act. The district court held that Boyd's Michigan Uniform Securities Act claim mirrored his Section 10(b) claim. R. 169 (Op. & Order at 15) (Page ID #4197). Boyd agrees on appeal that Count II rises or falls with Count I. D. 26 (Appellant Br. at 51 n.7). We therefore follow the district court's determination that "a securities claim under the Michigan Uniform Securities Act is 'nearly identical to the corresponding federal securities fraud claim,'" and affirm its judgment as to Count II. R. 169 (Op. & Order at 15) (Page ID #4197) (quoting *JAC Holding Enters., Inc. v. Atrium Cap. Partners, LLC*, 997 F. Supp. 2d 710, 739 (E.D. Mich. 2014)).

The same goes for Counts VI and VII, Boyd's contract claims for breach of representation and indemnification. R. 48 (Second Am. Compl. ¶¶ 240–49) (Page ID #885–87). Boyd agrees with the district court that these claims are also predicated on his securities-fraud claims. D. 26 (Appellant Br. at 61). Because we affirm the district court's judgment on Counts I and II, we likewise affirm its judgment on Counts VI and VII.

As for Counts IV and V, we follow a similar logic to arrive at the opposite conclusion. Counts IV and V of Boyd's complaint allege fraudulent misrepresentation, omission, and inducement. R. 48 (Second Am. Compl. ¶¶ 174–239) (Page ID #877–85). The district court applied Michigan law, finding that "[t]he false material representation needed to establish fraud may be satisfied by the failure to divulge a fact or facts the defendant has a duty to disclose."

R. 169 (Op. & Order at 18) (Page ID #4200) (quoting *McMullen v. Joldersma*, 435 N.W.2d 428, 430 (Mich. Ct. App. 1988)).  Boyd argues that if this court reverses the district court's grant of summary judgment on Count III (thus finding a genuine dispute as to whether the individual defendants violated a fiduciary duty to disclose), we should likewise reverse the district court's judgment on Counts IV and V.  D. 26 (Appellant Br. at 49).  Appellees do not address this issue in their brief and the record does not give us any reason to disagree with Boyd.  *See Talmer Bank & Tr. v. Minton Firm, P.C.*, 660 F. App'x 439, 446 n.5 (6th Cir. 2016).  Because Boyd has created a genuine dispute of material fact as to whether the defendants violated their common-law fiduciary duties to disclose material information, *see McMullen*, 435 N.W.2d at 430, we reverse the judgment on Counts IV and V.

### III.  CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's grant of summary judgment on Counts III, IV, and V, and **AFFIRM** its judgment on Counts I, II, VI, and VII of Boyd's Second Amended Complaint, and **REMAND** for further proceedings consistent with this opinion.